David. S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
P. Camille Guerra, SBN 326546
*camille@cglaw.com*
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811
Fax: (619) 544-9232

*Attorneys for Plaintiffs and*
*the Putative Classes*
*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GREENSTEIN, CYNTHIA NELSON, and SINKWAN AU, individually and on behalf of themselves and all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NOBLR RECIPROCAL EXCHANGE,<br><br>Defendant. | Case No. 4:21-cv-04537-JSW<br><br>**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

Plaintiffs Michael Greenstein, Cynthia Nelson, and Sinkwan Au, individually, and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Second Amended Class Action Complaint against Defendant Noblr Reciprocal Exchange and allege as follows:

## INTRODUCTION

1.      Every year millions of Americans have their most valuable personal information stolen and sold online because of unauthorized data disclosures. Despite warnings about the severe impact of unauthorized data disclosures on Americans of all economic strata, companies still fail to put adequate security measures in place to prevent the unauthorized disclosure of private data about their customers or potential customers.

2.      Defendant Noblr Reciprocal Exchange ("Defendant" or "Noblr"), provides insurance products, including car insurance, to Americans across the country. In doing so, it promises "[y]ou trust us with your information and we are committed to keeping that trust," "the security of your personal information is extremely important to us" and further promises in bold lettering "[w]e do not share your data or information without your permission."[1]

3.      Noblr failed to meet these promises and its obligation to protect the sensitive personal information entrusted to it.

4.      As reported by Noblr, on or about January 21, 2021, it "noticed unusual quote activity consisting of a spike in unfinished quotes through its instant quote webpage." It launched an investigation and learned that "attackers may have initiated these quotes in order to steal driver's license numbers which were inadvertently included in the page source code."[2] This means that for an unknown period of time before and including January 21, 2021, the drivers' license information of Plaintiffs and members of the class, who total almost a hundred thousand people, was publicly available on Noblr's website via the publicly-viewable page source code, which is code underlying a website that can be seen by

---

[1] https://www.noblr.com/privacy-policy/
[2] https://media.dojmt.gov/wp-content/uploads/noblr-notif.pdf (last visited May 29, 2021).

Plaintiffs' Second Amended Class Action Complaint

anyone at the click of a button, and was also being stolen by hackers through automated bot processes designed to cull large numbers of driver's license numbers for sale and use by hackers.

5.     As a corporation doing business in California, Noblr is legally required to protect the personal information ("PI") it gathers from unauthorized access and exfiltration.

6.     As a result of Noblr's failure to provide reasonable and adequate data security, Plaintiffs' and the Class Members' PI— including their especially sensitive driver's license information—has been exposed to those who should not have access to it. And at least one of the named Plaintiffs has *already* been the victim of identity theft. All Plaintiffs and the Class are now at much higher risk of identity theft and for cybercrimes of all kinds, especially considering the highly valuable and sought-after private PI stolen here, and have suffered damages related to lost time, loss of privacy, and other harms.

## THE PARTIES

7.     Defendant Noblr Reciprocal Exchange is an unincorporated association domiciled in Colorado with its principal place of business in San Francisco, California. Noblr is an insurance provider currently providing insurance in Arizona, Colorado, Ohio, Louisiana, Maryland, Pennsylvania, New Mexico, and Texas, and has insurance licenses in all fifty states.

8.     Plaintiff Michael Greenstein is a resident of Watchung, New Jersey. On or about May 2021, Plaintiff Greenstein received notice from Noblr that it improperly exposed his PI to unauthorized third parties. Plaintiff Greenstein never sought a quote for insurance of any sort from Defendant.

9.     Plaintiff Cynthia Nelson is a resident of Watertown, Massachusetts. On or about May 2021, Plaintiff Nelson received notice from Noblr that it improperly exposed her PI to unauthorized third parties. Plaintiff Nelson never sought a quote for insurance of any sort from Defendant.

Plaintiffs' Second Amended Class Action Complaint

10.     Plaintiff Sinkwan Au is a resident of Roslyn Heights, New York.  On or about May 2021, Plaintiff Au received notice from Noblr that it improperly exposed her PI to unauthorized third parties.  Plaintiff Au never sought a quote for insurance of any sort from Defendant.

## JURISDICTION AND VENUE

11.     Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members, at least one class member is a citizen of a state different from that of Defendant, and the amount in controversy exceeds $5 million, exclusive of interest and costs. The Court also has federal question jurisdiction under 28 U.S.C. § 1331 for the Drivers' Privacy Protection Act claims and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District, is registered to conduct business in California, and has sufficient minimum contacts with California.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and on information and belief, a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

14.     Application of California law to this dispute is proper because Defendant's headquarters are in California, the decisions, actions, and/or circumstances that gave rise to the underlying facts at issue in this Complaint were presumably made or taken in California, and the action and/or inaction at issue emanated from California.

## INTRADISTRICT ASSIGNMENT

15.     Pursuant to Civil L.R. 3-1 (c) and (d), assignment to the San Francisco Division is proper because a substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this district and specifically San Francisco County

where Defendant is headquartered.

## FACTUAL ALLEGATIONS

**A.    Noblr collects PI and fails to provide adequate data security**

16.    Noblr began as a car insurance start-up utilizing technology to provide a product to attract good drivers, "Using behaviour based pricing, Noblr calculated insurance premiums in real-time based on how a driver performs."[3]

17.    Noblr currently offers various types of insurance policies, including auto, renters, home and condo, and umbrella.[4]

18.    Like other insurance providers, Noblr offers a public-facing insurance quoting platform for visitors on its website. Visitors to Noblr's website can "Get A Quote" instantly after providing personal information.



19.    Noblr's quoting feature uses the information entered by the website's visitor, combines it with additional information the system matches, and then automatically pulls information from a third-party to provide the visitor a quote.

---

[3] https://www.artemis.bm/news/hudson-structured-invests-in-auto-insurtech-noblr/ (last visited May 29, 2021).
[4] https://www.noblr.com/coverages/

Plaintiffs' Second Amended Class Action Complaint

20.     Specifically, Noblr's quoting feature, which is still available on its website, asks a potential customer for a name, date of birth, and then an address. Once that information is entered, Noblr's system auto-populates the quotation with driver's license information and makes that information visible to the person entering the information on the Noblr quote website.

21.     Noblr's online quote website did not require verification that the person or automated process entering name, date of birth, and address information was the same person for whom the information was being entered. Instead, and unfortunately, Noblr's online quote system was configured to allow anyone with a few basic bits of data to get Noblr's system to auto-fill the remaining information, including driver's license numbers, from its databases, and provide it without any further confirmation as to who was receiving the information, thus allowing hackers to steal that information.

22.     In addition, Noblr put the driver's license information it had in its possession – via motor vehicle records and third-party sources – in the source code of its website, which is publicly viewable at the click of a button.  As a result, *even without the exploitation of hackers discovered by Noblr in 2021*, Noblr had intentionally put driver's license information for at least 97,633 people, as reported by Noblr, including both Noblr customers and the general public, including Plaintiffs, on its website available for hackers to steal en masse.

23.     On or around January 21, 2021, Noblr finally realized that its instant quote feature was being exploited by hackers who were using it to obtain the driver's license numbers and addresses of Plaintiffs and the members of the Class, which includes many people who never applied for insurance with Noblr or were even aware of its existence.

24.     This incident is referred to herein as the "Unauthorized Data Disclosure."

25.     The named Plaintiffs received a letter from Noblr entitled "Notice of Data Security Incident Involving Your Personal Data," dated May 14, 2021. The

letter stated that their PI, detailed below, may have been compromised, and included the following:

**What Happened**

On January 21, 2021, Noblr's web team noticed unusual quote activity consisting of a spike in unfinished quotes through its instant quote web page. Noblr immediately launched an internal investigation. The initial investigation revealed that attackers may have initiated these quotes in order to steal driver's license numbers which were inadvertently included in the page source code.

As described above, the instant quote process works by taking personal data (name and date of birth) entered into the system and matching it with related information automatically pulled from a third-party to help provide a quote. The attackers appear to have already been in possession of the names and dates of birth of consumers, and then used that information to obtain additional personal information through Noblr's instant quote platform. Attackers could also have gone through the entire quote process to access personal information in the final policy application documents provided after obtaining a quote.

On January 25, 2021, following the initial discovery of unusual quote activity, Noblr's security team began blocking suspicious IP addresses. On January 27, 2021, when Noblr determined that the attackers were able to access driver's license numbers, Noblr altered its instant quote system to prevent further access by the attackers and took other steps to combat these attacks.

**What Information Was Involved**

Our records indicate that your name, driver's license number, and address may have been accessed.

**Actions We've Taken to Safeguard Your Information**

We take our responsibility to safeguard your personal information seriously. We immediately took steps to remedy the situation, including blocking suspicious IP addresses, revising rate limit thresholds to adjust specific traffic patterns, and altering the instant quote system to mask driver's license numbers in the source code and in the final application

page. In addition, we are developing and employing certain changes to processes and protocols to prevent this type of event from happening again.[5]

26.    The Notice confirms that Plaintiffs became victims of the Unauthorized Data Disclosure even though they did not have a prior relationship with Noblr, Indeed the Notice advised that "you may be affected even if you have no relationship with Noblr if your information, or the information of someone in your household, was used by the attackers in connection with this incident."

27.    The Notice also confirms that at least 97,633 people were affected by the Unauthorized Data Disclosure, and that driver's license numbers, as well as non-driver identification card numbers, were acquired.[6] And the Notice confirms that the hackers *already had* PI about Plaintiffs and Class Members and used the Defendant's website to obtain and link additional PI, including driver's license numbers and addresses.[7]

28.    After receiving Unauthorized Data Disclosure notice letters, it is reasonable for Plaintiffs and Class Members in this case to believe that the risk of future harm (including identity theft) is substantial and imminent, and to take steps to mitigate that substantial risk of future harm. In fact, Noblr's letter encourages affected individuals to use the identity theft protection service it offers to Plaintiffs and the Class to help protect their "identity from misuse" and that they should, among other things, "regularly review statements from your accounts and periodically obtain your credit report."

---

[5] Noblr's *Notice of Data Security Incident Involving Your Personal Information*, as filed with the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/c43bf2a1-cea9-45fa-81bf-47d299a7216d.shtml (last visited on May 29, 2021).
[6] *Id.*
[7] *Id.*

Plaintiffs' Second Amended Class Action Complaint

**B.      The PI exposed by Noblr as a result of its inadequate data security is highly valuable on the black market**

29.     The information exposed by Noblr is very valuable to phishers, hackers, identity thieves and cyber criminals, especially at this time where unprecedented numbers of criminals are filing fraudulent unemployment benefit claims and driver's license information is uniquely connected to the ability to file a fraudulent unemployment benefit claim.

30.     Indeed, these hackers often aggregate information taken from these breaches on users to build profiles on individuals. These profiles combine publicly available information with information discovered in previous data breaches and exploited vulnerabilities. There are few data breaches that provide a comprehensive snapshot of any one individual person. Unique and persistent identifiers such as Social Security Numbers, driver's license numbers, usernames, and financial account numbers (e.g., credit cards, insurance policy numbers, etc.) are critical to easily forging an identity. When not all information is available, the information that is stolen is used to socially engineer a victim into providing additional information so a "fullz"[8] profile can be obtained.

31.     For example, a health care system and a retail store point-of-sale system may have two unrelated data breaches where an individual's information is taken. The individual's driver's license may not be in either of those data bases, but after the Unauthorized Data Disclosure, a threat actor could have improved the profile and added a driver's license number. The value of that profile would allow such crimes as identity theft, financial crimes, and even illegal voting that would not previously have been possible.

---

[8] "Fullz" is slang used by threat actors and various criminals meaning "full information," a complete identity profile or set of information on any entity or individual.

Plaintiffs' Second Amended Class Action Complaint

32.     There is no legitimate or legal reason for anyone to use Noblr's inadequate website security to acquire driver's license information for 97,833 people. The only reason is for immediate or eventual malicious intent, since no one would go to the trouble of obtaining data that had no value. Any non-public data, especially government issued identification numbers like a driver's license or non-driver's identification number, has criminal value. On the darknet markets, a driver's license, combined with the full name and state issued, is a sought-after data point. Darknet markets are a downstream "flea market" for data to be sold, usually not by the original threat actor or criminal group. It is a dumping ground, usually after the data has been exploited.

33.     The value of stolen driver's license information currently has a darknet market (DNM) value of $1 per license. This was re-verified on March 3, 2022, accessing several DNM using a trusted identity. Social Security Numbers, once considered the "gold standard" of identity fraud, are also selling for $1 per value in those same markets. This illustrates the value of driver's license information to cybercriminals and people committing identity fraud. According to popular darknet markets, cyber criminals value driver's licenses equally to Social Security Numbers.

34.     In some ways, driver's license numbers are even more attractive than Social Security Numbers to threat actors and more dangerous to the consumer when compromised. Unlike a Social Security Number, a driver's license number isn't monitored as closely, so it can potentially be used in ways that won't immediately alert the victim. Threat actors know this as well.  Because driver's licenses contain, or can be used to gain access to, uniquely qualifying and comprehensive identifying information such as eye color, height, weight, sex, home address, medical or visual restrictions, and living will/health care directives, most insurance and credit agencies highly recommend that immediate notice, replacement, and identity theft protections

Plaintiffs' Second Amended Class Action Complaint

are put in place for a minimum of 3 years.[9] Most cyber experts, including Enterprise Knowledge Partners, recommend five years or more.

35.     Stolen driver's licenses can be used (alone or in combination with other information) by malicious actors to accomplish the following:

- Apply for credit cards
- Apply for financial loans (especially student loans)
- Open bank accounts
- Obtain or create fake driver's licenses
  - Given to police for tickets
  - Provided to accident victims
  - Collect government unemployment benefits
  - Create and sell underage fake IDs
- Replace/access account information on:[10]
  - LinkedIn
  - Facebook/Meta
  - WhatsApp
  - Instagram
- Obtain a mobile phone
- Dispute or prove a SIM swap
- Redirect U.S. mail
- Apply for unemployment benefits

---

[9] *See, e.g.*, https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/; https://us.norton.com/internetsecurity-id-theft-lost-or-stolen (last accessed Mar. 7, 2022).

[10] A copy of a driver's license with a validated driver's license number is required to recover an online account or to have a suspected cloned / fraudulent account removed. *See, e.g.*, https://www.linkedin.com/pulse/facebook-coerces-victims-fraud-upload-birth-voter-id-card-scheinker/ (last accessed Mar. 7, 2022).

Plaintiffs' Second Amended Class Action Complaint

- Undocumented aliens may use them as a method to gain access to the U.S., and claim a lost or stolen passport
- Create a fake license as a baseline to obtain a Commercial Driver's License
- File tax returns or gain access to filed tax returns[11]
- Engage in phishing and other social engineering scams

36.     The process that was used to extract the data from Noblr's website based on its flaws and lack of security was likely automated. The Notice seemingly confirms this when it notes that the Unauthorized Data Disclosure was discovered when "Noblr's web team noticed *unusual quote activity consisting of a spike* in unfinished quotes through its instant quote web page" (emphasis added) and confirmed that threat actors like those described herein were at fault as "attackers appear to have already been in possession of the names and dates of birth of consumers, and then used that information to obtain additional personal information through Noblr's instant quote platform."

37.     Unsecured sites that contain or transmit PI, such as a driver's license, require notice to consumers when the data is stolen because it can be used to perform identity theft and other types of fraud. A threat actor is usually motivated by financial or political gain before it exerts time, and skill to compromise and exfiltrate. Over time, identity thieves have systematized their criminal activities to gather important pieces of a synthetic identity from multiple breaches and sources. The theft of a driver's license number is no less valuable in that endeavor than the theft of a Social Security Number, as demonstrated by these two unique identifiers carrying the same price on the darknet, and by the fact that the identity thieves have demonstrated a systematic and businesslike process for collecting these stolen driver's license numbers in this Unauthorized Data Disclosure and others committed

---

[11] https://blog.rodefermoss.com/keeping-your-drivers-license-number-safe-may-prevent-tax-fraud

Plaintiffs' Second Amended Class Action Complaint

against insurers. Cybercrime has been on the rise for the past decade and continues to climb exponentially; as of 2013 it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[12]

38.   As alleged above, stolen PI is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

39.   When malicious actors infiltrate companies and copy and exfiltrate the PI that those companies store, or have access to, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[13]

40.   For example, when the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PI] belonging to victims from countries all over the world. One of the key challenges of protecting PI online is its pervasiveness. As unauthorized data disclosures in the news continue to show, PI about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[14]

---

[12] Pascual, Al, "2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters," *Javelin* (Feb. 20, 2013).

[13] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce, Dec. 28, 2020, *available at:* https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited May. 29, 2021).

[14] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor,

Plaintiffs' Second Amended Class Action Complaint

41.     The PI of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200[15] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[16] (Note:  the prices can vary depending on the point in the chain – verified identities may sell for higher prices early in the chain, then for the lower prices described above when they reach the "flea market sites.")  The information compromised in the Unauthorized Data Disclosure is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. And the information compromised in the Unauthorized Data Disclosure can be used to *open* fraudulent bank accounts and credit and debit cards, compounding the identity theft and cycle of black market sales detailed above. The information compromised in this Unauthorized Data Disclosure is also more valuable because driver's license numbers, non-driver's identification numbers, and addresses are difficult and likely highly problematic, to change.

42.     Recently, Forbes writer Lee Mathews reported on Geico's similar unauthorized data disclosure wherein the hackers also targeted driver's license numbers, "Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license

April 3, 2018, *available at:* https://www.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited June 10, 2021).

Plaintiffs' Second Amended Class Action Complaint

can sell for around $200."[17]

43.    National credit reporting company, Experian, blogger Sue Poremba also emphasized the value of driver's license to thieves and cautioned:

> If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license is one of the most important pieces to keep safe from thieves.[18]

44.    In fact, according to CPO Magazine, which specializes in news, insights and resources for data protection, privacy and cyber security professionals, "[t]o those unfamiliar with the world of fraud, *driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation*. Tim Sadler, CEO of email security firm Tessian, points out why *this is not the case* and why these numbers are very much sought after by cyber criminals: "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks. . . . bad actors may be using these driver's license numbers to fraudulently apply for unemployment benefits in someone else's name, a scam proving especially lucrative for hackers as

---

[17] Lee Mathews, *Hackers Stole Customers' License Numbers from Geico in Months-Long Breach*, (April 20, 2021), *available at*: https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3066c2218658 (last visited May 29, 2021).

[18] Sue Poremba, *What should I do If My Driver's License Number is Stolen?* (Oct. 24, 2018), *available at*: https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last visited May 29, 2021).

1   unemployment numbers continue to soar. . . . In other cases, a scam using these
2   driver's license numbers could look like an email that impersonates the DMV,
3   requesting the person verify their driver's license number, car registration or
4   insurance information, and then inserting a malicious link or attachment into the
5   email." (emphasis added).

6         45.    Drivers' license numbers have been taken from auto-insurance providers
7   by hackers in other circumstances, including Geico, American Family, Farmers, and
8   Midvale all in 2021, indicating both that this particular form of PI is in high demand
9   and also that Noblr knew or had reason to know that its security practices were of
10  particular importance to safeguard consumer data.[19]

11        46.    In fact, when Geico announced that its online quoting platform—which is
12  nearly identical to Noblr's—was subject to a near-identical breach, its data breach
13  notice filed with the California Attorney General explicitly stated that GEICO had
14  "reason to believe that this information could be used to fraudulently apply for
15  unemployment benefits in your name."[20]

16        47.    Further, an article on TechCrunch explains that it is driver's license or
17  non-driver's identification numbers themselves that are the critical missing link for a
18  fraudulent unemployment benefits application: "Many financially driven criminals
19  target government agencies using stolen identities or data. But many U.S. states
20  require a government ID — like a driver's license — to file for unemployment

21  _____

22  [19] *See* United States Securities and Exchange Commission Form 8-K for INSU
23  Acquisition Corp. II (Feb. 1, 2021),
     https://www.sec.gov/Archives/edgar/data/1819035/000121390021005784/ea134248-
24  8k_insuacquis2.htm?=1819035-01022021 (accessed Apr. 27, 2021) (announcing a
     merger with auto-insurance company MetroMile, Inc., an auto-insurer, which
25  announced a drivers' license number Data Disclosure on January 19, 2021); Ron
26  Lieber, *How Identity Thieves Took My Wife for a Ride*, N.Y. TIMES (Apr. 27, 2021)
27  (describing a scam involving drivers' license numbers and Progressive Insurance).
     [20]  *See https://www.documentcloud.org/documents/20618953-geico-data-breach-
28  notice* (GEICO notice filed with California Attorney General dated April 9, 2021)

Plaintiffs' Second Amended Class Action Complaint

benefits. To get a driver's license number, fraudsters take public or previously breached data and exploit weaknesses in auto insurance websites to obtain a customer's driver's license number. That allows the fraudsters to obtain unemployment benefits in another person's name."[21]  Driver's license number are thus the critical piece of data needed to apply fraudulently for unemployment benefits.

48.    For example, the New York State Department of Financial Services issued an industry letter on February 16, 2021, stating that they had "recently learned of a systemic and aggressive campaign to exploit cybersecurity flaws in public-facing websites to steal [NPI, including] websites that provide an instant quote. . . .   [I]t received reports from two auto insurers in late December 2020 and early January 2021, that cybercriminals were targeting their websites that offer instant [] quotes [] to seal unredacted driver's license numbers. . . . . DFS has confirmed that, at least in some cases, this stolen information has been used to submit fraudulent claims for pandemic and unemployment benefits."[22]

49.    Once PI is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details, or to fraudulently manufacture new accounts for access and sale. This can lead to additional PI being harvested from the victim, as well as PI from family, friends and colleagues of the original victim.

50.    According to the FBI's Internet Crime Complaint Center (IC3) 2019

---

[21]  Zach Whittaker, *Geico Admits Fraudsters Stole Customers' Driver's License Numbers for Months*, TechCrunch (Apr. 19, 2021), https://techcrunch.com/2021/04/19/geico-driver-license-numbers-scraped/#:~:text=To%20get%20a%20driver's%20license,benefits%20in%20another%20person's%20name (last accessed Mar. 2, 2022).
[22] https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210216_cyber_fraud_alert (last accessed March 7, 2022).

Plaintiffs' Second Amended Class Action Complaint

Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

51.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiffs and Class Members that their PI had been stolen. It took Noblr almost four months to do so. This means that for those four months, it was not possible for law enforcement to stop identity theft experienced by Plaintiffs and members of the class, and also prevented Plaintiffs and members of the class from starting to take mitigative steps to protect themselves from their substantial and incremental increased risk of identity theft.

52.     Victims of drivers' license number theft also often suffer unemployment benefit fraud, as discussed above, as well as harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

53.     Unauthorized data disclosures facilitate identity theft as hackers obtain consumers' PI and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PI to others who do the same.

54.     For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PI to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[23] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to

---

[23] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), available at http://www.gao.gov/assets/270/262899.pdf (last visited May 29, 2021).

Plaintiffs' Second Amended Class Action Complaint

become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[24]

## C. Noblr was on notice of the sensitivity and private nature of the PI it utilized for insurance quotes and its duty to safeguard it

55. "Insurance companies are desirable targets for cyber attackers because they work with sensitive data."[25] In fact, according to the Verizon 2020 Data Breach Investigations Report there were 448 confirmed data breaches in the financial and insurance industries.[26]

56. Noblr claims it "uses commercially reasonable and industry standard administrative, technical, personnel, and physical security measures designed to protect the information we collect about you from loss, theft, and unauthorized use, disclosure, or modification," however, those safety and security measures were insufficient. And while Noblr states that the information is protected in an encrypted environment,[27] it was not. The weakness in Noblr's system allowed access and ability to exfiltrate Plaintiffs' and the Class Members' addresses and driver's license numbers.

57. In addition, Noblr is an insurance company that sells auto insurance and uses motor vehicle records to verify identities and underwrite policies. Its underwriting and other insurance activities are explicitly subject to the DPPA, which

---

[24] *Id.*

[25] Data Protection Compliance for the Insurance Industry (October 7, 2020), *available at*: https://www.ekransystem.com/en/blog/data-protection-compliance-insurance-industry (last visited May 29, 2021).

[26] Verizon 2020 Data Breach Investigations Report (2020), available at: https://enterprise.verizon.com/content/verizonenterprise/us/en/index/resources/reports/2020-data-breach-investigations-report.pdf (last visited May 29, 2021).

[27] *Id.*

Plaintiffs' Second Amended Class Action Complaint

was enacted in 1994 and has been in effect for Noblr's entire existence as a company, as Noblr was founded in 2017.[28]

58.     Even among insurance companies who sell auto policies, Noblr was uniquely situated to know it was using PI and other sensitive information in its business. Noblr's business model is predicated on using behavioral information and ongoing information about customers to keep costs for policies down by rewarding good driving. According to Noblr investors, "Using behaviour based pricing, Noblr calculated insurance premiums in real-time based on how a driver performs. The company says good drivers can save up to 51% on their auto insurance premiums, while its highly personalised pricing model help directly incentivise better driving and as a result safer roads as well."

59.     In addition, Noblr consciously uses PI and information about customers on an *ongoing* basis. As CEO Gary Tolman noted, "We believe good drivers deserve fairer and more transparent car insurance rates, along with the tools they need to continuously improve their driving to earn lower premiums and create safer roads for all."[29] Noblr's continual collection of PI in the form of customer information, driving records, accident reports, and other motor vehicle information, along with its insurance underwriting and business collection of driver's license and other motor vehicle information, put it in the position of knowing that it was obligated to protect the privacy of its customers and potential customers like Plaintiffs and members of the class.

**D.     Noblr failed to comply with Federal Trade Commission requirements**

60.     Federal and State governments have established security standards and issued recommendations to minimize unauthorized data disclosures and the resulting

---

[28] *See* Bloomberg Profile for Gary Charles Tolman, Founder and CEO of Noblr Inc, https://www.bloomberg.com/profile/person/3362775 (last visited Mar. 3, 2022) (listing Noblr's date of incorporation as October 17, 2017).
[29] *See supra* note 3.

harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[30]

61.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[31] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[32]

62.     Also, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[33]

63.     Highlighting the importance of protecting against unauthorized data disclosures, the FTC has brought enforcement actions against businesses for failing

---

[30] *See* Federal Trade Commission, *Start With Security* (June 2015), available at: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 29, 2021).
[31] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 29, 2021).
[32] *Id.*
[33] Federal Trade Commission, *Start With Security*, *supra* footnote 25.

Plaintiffs' Second Amended Class Action Complaint

to adequately and reasonably protect PI, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[34]

64.     Through negligence in securing Plaintiffs' and Class Members' PI and allowing the thieves to utilize its instant quote website platform to obtain access and exfiltrate individuals' PI, Noblr failed to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and the Class Members' PI. Noblr's data security policies and practices constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, and violate the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 6801.

**E. Noblr Contravenes the Purpose of the Driver's Privacy Protection Act**

65.     Prior to the enactment of the Driver's Privacy Protection Act, Congress found that most states freely turned over DMV information to whomever requested it with only few restrictions. 137 Cong. Rec. 27,327 (1993).

66.     Due to this lack of restrictions, Congress grew concerned that potential criminals could easily access home addresses and telephone numbers of potential victims. 140 Cong. Rec. 7929 (1994) (statement of Rep. Porter Goss).

67.     These concerns did, in fact, materialize in the occurrence of crime, harassment, and stalking. Most notably, in 1989, a stalker shot and killed Rebecca Schaeffer, an upcoming actor, after obtaining her unlisted home address from the California DMV. 137 Cong. Rec. 27,327 (1993). In advocating for the DPPA,

---

[34] Federal Trade Commission, *Privacy and Security Enforcement Press Releases*, available at https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Jan. 8, 2021).

Plaintiffs' Second Amended Class Action Complaint

Representative Jim Moran (D-VA) recounted thieves using information from the DMV to learn home addresses and commit burglary and theft. 137 Cong. Rec. 27,327 (1993). Similarly, Senator Barbara Boxer (D-CA) explained how a man used the DMV to obtain the home addresses of several young women and sent them harassing letters. 39 Cong. Rec. 29,466 (1993). In another instance, a woman who visited a clinic that performed abortions found black balloons outside her home after a group of anti-abortion activists sought to harass her upon seeing her car in the clinic's parking lot. 139 Cong. Rec. 29,462 (1993) (statement of Sen. Chuck Robb).

68.     In light of public outrage over the Schaeffer murder and growing concern for the threat to public safety that free access to DMV records posed, Congress enacted the DPPA "to protect the personal privacy and safety of licensed drivers consistent with the legitimate needs of business and government." S. Res. 1589, 103rd Cong. §1(b), 139 Cong. Rec. 26,266 (1993) (enacted).

69.     Additionally, in enacting the DPPA, Congress was motivated by its "[c]oncern[] that personal information collected by States in the licensing of motor vehicle drivers was being released – even sold – with resulting loss of privacy for many persons." *Akkawi v. Sadr*, 2:20-CV-01034-MCE-AC, 2021 WL 3912151, at *4 (E.D. Cal. Sept. 1, 2021) (citing *Maracich v. Spears*, 570 U.S. 48, 51–52 (2013) (alterations in original)). The sale of private information like driver's license numbers and other motor vehicle records was the exact impetus for the DPPA's passage.

70.     As such, Congress sought to expressly prohibit "disclosing personal information obtained by the department in connection with a motor vehicle record." *Chamber of Commerce of United States v. City of Seattle*, 274 F. Supp. 3d 1140, 1154 (W.D. Wash. 2017). Driver's license numbers are thus explicitly listed as "personal information" from "motor vehicle records" under the DPPA.  *See* 18 U.S.C. 2725(1).

71.     By making the PI of Plaintiffs and the Class publicly available, Noblr ran

afoul the purpose of DPPA, and threatened the privacy and safety of licensed drivers, for whose protection the statute was enacted. Noblr's actions constituted a concrete injury and particularized harm to Plaintiffs and members of the Class, that would not have happened but for Noblr's failure to follow the DPPA.  Plaintiffs were harmed by the public disclosure of their private facts in addition to the other harms enumerated herein.

**F. Noblr's Failure to Secure Driver's License Information on its Website Independently Violates the DPPA and Harmed Plaintiffs and the Class**

72.     In addition to allowing driver's license numbers to be queried at will by hackers for at least the period of time identified by Noblr in the Notice received by Plaintiffs, Noblr's privacy violations of Plaintiffs and members of the class and public disclosure of private facts like driver's license information was far more egregious than even other recent disclosures of driver's license information by insurance companies.  This is because Noblr's Notice admits that it placed the driver's license information of an untold number of potential customers *in the source code of its website*, which is *publicly available*, for some unknown period of time up to and until at least January 27, 2021.

73.     "Every major Internet browser allows users to view the HTML source code of any web page they visit."  While the method of access varies by web browser, source code information is a part of a website that is public and routinely visited by journalists, the public, and hackers alike.  For example, on Google Chrome, any user can press "Ctrl + U" and the source code will appear, or right-click on a blank part of the web page and select "View page source."[35]

---

[35] *See* Computer Hope, Free computer help since 1998, *How to View the HTML source code of a web page*, https://www.computerhope.com/issues/ch000746.htm#:~:text=Method%202-,Right%2Dclick%20a%20blank%20part%20of%20the%20web%20page%20and,source%20code%20of%20a%20page (last accessed Mar. 2, 2022).

Plaintiffs' Second Amended Class Action Complaint

74.    Website source code is a routine source for both legitimate and illegitimate seekers of information.  For example, in October 2021, reporter Josh Renaud reported that the State of Missouri's "Department of Elementary and Secondary Education website source code had exposed the social security numbers of over 100,000 school teachers, administrators, and counselors. He published the story only after he'd reported the problem to the state and the vulnerability had been resolved." He did so by looking at the publicly-available, unencrypted source code of the state website. As an article explaining the situation noted, "A website's source code is typically available to anyone using a web browser. While scraping it requires some technical knowledge, just looking at it is as simple as opening the "Developer Tools" option available in nearly every web browser, including Chrome, Safari, Firefox, and Edge. If you want, you can go look at The Verge's source code right now."[36]

75.    As the FBI noted in the situation involving the state of Missouri above, when a company like Noblr puts unencrypted PI in the source code of the website, that is not a network intrusion; it's a failure by the company, an instance where a database is "misconfigured," and thus would "allow[] open source tools to be used to query data that should not be public."[37]

76.    Here, Noblr's Notice states that "The initial investigation revealed that attackers may have initiated these quotes in order to steal driver's license numbers

---

[36] Alex Cranz, *The Governor of Missouri Still Doesn't Know How Websites Work,*" The Verge (Dec. 31, 2021), https://www.theverge.com/2021/12/31/22861188/missouri-governor-mike-parson-hack-website-source-code (last accessed Mar. 3, 2022).

[37] Jack Suntrup, *Missouri Officials Planned to Thank Post-Dispatch Before Threatening Newspaper, Emails Show*, St. Louis Post-Dispatch (Dec. 3, 2021), https://www.stltoday.com/news/local/govt-and-politics/missouri-officials-planned-to-thank-post-dispatch-before-threatening-newspaper-emails-show/article_0f6c5288-cd11-569c-804e-9b280e9c1e68.html (last accessed Mar. 3, 2022).

4:21-cv-04537-JSW

Plaintiffs' Second Amended Class Action Complaint

which were inadvertently included in the page source code." Thus, driver's license information was both unencrypted and publicly available on its website, and also queried in a manner that indicates was designed to be used for theft.

77.    Source code is created intentionally by a company as part of its creation and maintenance of a website. Noblr wrote, created, and updated the source code on its website over the course of its existence as a company, and as evidenced by its Notice, which outlined changes made to the Noblr website after the Unauthorized Data Disclosure.

78.    None of Plaintiffs or members of the class authorized Noblr to place their unencrypted driver's license or non-driver's identification numbers on their website in the source code, and doing so is not a permissible use of such information under the DPPA. The inclusion of such information on Noblr's website also constitutes the public disclosure of private facts and an invasion of privacy for Plaintiffs and members of the class.

**G.    Plaintiffs' attempts to secure their PI after the breach**

***Plaintiff Greenstein***

79.    In May 2021, Plaintiff Greenstein received notice from Noblr dated May 14, 2021("Notice Letter").  The Notice Letter informed him of the Unauthorized Data Disclosure and that his driver's license number and address may have been accessed.  Plaintiff Greenstein was not a customer of Noblr and had not requested an insurance quote from Defendant.

80.    Plaintiff Greenstein researched his options to respond to the theft of his driver's license. He spent and continues to spend additional time reviewing his credit monitoring service results and reports from other online resources concerning the security of his identity and financial information. This is time Plaintiff Greenstein otherwise would have spent performing other activities, such as his job and/or leisurely activities for the enjoyment of life.

81.    Plaintiff Greenstein has never knowingly transmitted unencrypted PI

over the internet or any other unsecured source. He deletes any and all electronic documents containing his PI and destroys any documents that contain any of his PI, or that may contain any information that could otherwise be used to compromise his PI.  Plaintiff Greenstein has not received a notice that his driver's license number was compromised in any other data breach or unauthorized data disclosure.

82.    Plaintiff Greenstein suffered actual injury from having his PI exposed as a result of the Unauthorized Data Disclosure including, but not limited to: (a) damages to and diminution in the value of his PI—a form of intangible property; (b) loss of his privacy; and (c) imminent and impending injury arising from the increased risk of fraud and identity theft.

83.    As a result of the Unauthorized Data Disclosure, Plaintiff Greenstein will continue to be at heightened risk for financial fraud, future identity theft, other forms of fraud, and the attendant damages, for years to come.

***Plaintiff Nelson***

84.    In May 2021, Plaintiff Nelson received notice from Noblr dated May 14, 2021 ("Notice Letter").  The Notice Letter informed her of the Unauthorized Data Disclosure and that her driver's license number and address may have been accessed.  Plaintiff Nelson was not a customer of Noblr and had not requested an insurance quote from Defendant.

85.    As a result, Plaintiff Nelson notified her bank and financial planner of the Unauthorized Data Disclosure.  She also contacted her local police department.

86.    Plaintiff Nelson researched her options to respond to the theft of her driver's license. She spent and continues to spend additional time reviewing her credit monitoring service results and reports from other online resources concerning the security of her identity and financial information. This is time Plaintiff Nelson otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

87.    Plaintiff Nelson has never knowingly transmitted unencrypted PI over the

Plaintiffs' Second Amended Class Action Complaint

internet or any other unsecured source. She deletes any and all electronic documents containing her PI and destroys any documents that contain any of her PI, or that may contain any information that could otherwise be used to compromise her PI. Plaintiff Nelson has not received a notice that her driver's license number was compromised in any other data breach or unauthorized data disclosure.

88.    Plaintiff Nelson suffered actual injury from having her PI exposed as a result of the Unauthorized Data Disclosure including, but not limited to: (a) damages to and diminution in the value of her PI—a form of intangible property; (b) loss of her privacy; and (c) imminent and impending injury arising from the increased risk of fraud and identity theft.

89.    As a result of the Unauthorized Data Disclosure, Plaintiff Nelson will continue to be at heightened risk for financial fraud, future identity theft, other forms of fraud, and the attendant damages, for years to come.

**_Plaintiff Au_**

90.    In May 2021, Plaintiff Au received notice from Noblr dated May 14, 2021 ("Notice Letter").  The Notice Letter informed her of the Unauthorized Data Disclosure and that her driver's license number and address may have been accessed.  Her husband received a Notice Letter as well as to his own information. Plaintiff Au was not a customer of Noblr and had not requested an insurance quote from Defendant, nor had her husband.

91.    Following the Unauthorized Data Disclosure, in January 2021, Plaintiff Au's data was fraudulently used to apply for unemployment benefits in New York. Unemployment fraud is specifically tied to the use of breached driver's license numbers – see paragraphs 47-49 above.

92.    As a result, Plaintiff Au contacted the local police department and filed a police report.  She also filed a fraud report with New York State Department of Labor.

93.    To this day Plaintiff Au's injury prevents her from conducting ordinary

Plaintiffs' Second Amended Class Action Complaint

business.  Before suffering identity theft, she was able to sign into **my.ny.gov** to file unemployment easily. But now, when she attempts to sign into the "file unemployment claim" section, she is told there is a different NY.gov username linked to her social security number.  In particular, someone had created a complete different NY.gov username for NY unemployment. Once the **first** claim was filed under that fraudulent NY.gov username, her social security number became linked to that user ID permanently. Plaintiff Au has had no success in reversing or even stopping the damage she has suffered as a result of the subject Noblr Unauthorized Data Disclosure. Communications with the unemployment department do not go through without a passcode for the account.  Plaintiff Au has no access to the passcode to due to the theft of her identity.

94.    Plaintiff Au researched her options to respond to the theft of her driver's license identification and information, and took action including purchasing IDShield family plan credit monitoring for her and her husband for which she pays a monthly fee. She spent and continues to spend additional time reviewing her credit monitoring service results and reports from other online resources concerning the security of her identity and financial information. This is time Plaintiff Au otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

95.    Plaintiff Au has never knowingly transmitted unencrypted PI over the internet or any other unsecured source. She deletes any and all electronic documents containing her PI and destroys any documents that contain any of her PI, or that may contain any information that could otherwise be used to compromise her PI. Plaintiff Au has not received a notice that her driver's license number was compromised in any other data breach or unauthorized data disclosure.

96.    The identity theft suffered by Plaintiff Sinkwan Au is logically and temporally linked to the Unauthorized Data Disclosure in the same way that other data breach cases have found to be "fairly traceable." Her driver's license number

was stolen shortly before she experienced a fraudulent unemployment claim being filed in her name – a form of identity theft specifically linked to stolen driver's license numbers. In most cases, stolen data is rarely attributed to the source when it is sold. If sources in darknet markets were named, then law enforcement and ethical hackers would immediately notify the company hacked and law enforcement so that victims had the opportunity to make the appropriate changes and apply monitoring. This makes the stolen data less valuable and less reliable to criminals. Therefore, stolen data is often obfuscated, parsed, and sold in pieces. It is also often combined with other stolen data, further making attribution to the source very difficult. The seller is rarely the original threat actor that performed the exploit.  Darknet markets and forums rarely allow a market buyer to examine the entire data set before buying for obvious reasons. For this reason, case law in many jurisdictions has based its "fairly traceable" inquiry on the temporal and logical connections described above.

97.    Plaintiff Au's information is for sale on the darknet, as confirmed on March 3, 2022, by accessing several Darknet Markets using a trusted identity, which found a driver's license and a student id available for sale in her name on just one of these sites.  Plaintiff Au's name is unusual.

98.    Plaintiff Au suffered actual injury from having her PI exposed as a result of the Unauthorized Data Disclosure including, but not limited to: (a) damages to and diminution in the value of her PI—a form of intangible property; (b) loss of her privacy; and (c) fraud and imminent and impending injury arising from the increased risk of further fraud and identity theft.

99.    As a result of the Unauthorized Data Disclosure, Plaintiff Au will continue to be at heightened risk for financial fraud, future identity theft, other forms of fraud, and the attendant damages, for years to come.

**H. Plaintiffs and Class Members suffered damages**

100.   Each of the Plaintiffs and Class Members are at risk for actual identity theft in addition to all other forms of fraud.

Plaintiffs' Second Amended Class Action Complaint

101.  The ramifications of Noblr's failure to keep individuals' PI secure are long lasting and severe. Once PI is stolen, fraudulent use of that information and damage to victims may continue for years.[38]

102.  The PI belonging to Plaintiffs and Class Members is private, valuable and is sensitive in nature as it can be used to commit a lot of different harms in the hands of the wrong people. Defendant Noblr failed to obtain Plaintiffs' and Class Members' consent to disclose such PI to any other person as required by applicable law and industry standards.

103.  Noblr's inattention to the possibility that anyone, especially thieves with various pieces of individuals' PI, could obtain any individual's PI who utilized its front-facing instant quote platform left Plaintiff and Class Members with no ability to protect their sensitive and private information.

104.  Noblr had the resources necessary to prevent the Unauthorized Data Disclosure, but neglected to adequately implement data security measures, despite its obligations to protect PI of the Plaintiffs and Class Members from unauthorized disclosure.

105.  Had Noblr remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its systems and, ultimately, the theft of PI.

106.  As a direct and proximate result of Noblr's actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the

---

[38] *2014 LexisNexis True Cost of Fraud Study*, (August 2014), *available at*: https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last visited May 29, 2021).

4:21-cv-04537-JSW

Plaintiffs' Second Amended Class Action Complaint

Unauthorized Data Disclosure on their lives.

107.   The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[39]

108.   As a result of Noblr's failures to prevent the Unauthorized Data Disclosure, Plaintiffs and Class Members have suffered, will suffer, and are at increased risk of suffering:

   a.   The compromise, publication, theft, and/or unauthorized use of their PI,

   b.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud,

   c.   Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Unauthorized Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud,

   d.   The continued risk to their PI, which remains in the possession of Noblr and is subject to further breaches so long as Noblr fails to undertake appropriate measures to protect the PI in its possession; and

   e.   Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Unauthorized Data Disclosure for the remainder of the lives of Plaintiffs and Class Members.

---

[39] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013, *available at*: https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited May 29, 2021).

109.   In addition to a remedy for the economic harm, Plaintiffs and the Class Members maintain an undeniable interest in ensuring that their PI is secure, remains secure, and is not subject to further misappropriation and theft.

110.   To date, other than providing 12 months of credit monitoring and identity protection services, Noblr does not appear to be taking any measures to assist Plaintiffs and Class Members other than simply telling them to do the following:

- "regularly review statements from your accounts"
- "periodically obtain your credit report"
- "remain vigilant with respect to viewing your account statements and credit reports"
- obtain a copy of a free credit report
- contact the FTC and/or the state Attorney General's office to obtain additional information about avoiding identity theft

None of these recommendations, however, require Noblr to expend any effort to protect Plaintiffs' and Class Members' PI.  It is also not clear that Noblr has made any determination that the credit monitoring and identity protection services are designed or adequate to ameliorate the specific harms of having an exposed driver's license number and address.

111.   Noblr's failure to adequately protect Plaintiffs' and Class Members' PI has resulted in Plaintiffs and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money. Instead, as Noblr's Notice indicates, it is putting the burden on Plaintiffs and Class Members to discover possible fraudulent activity and identity theft.

112.   Noblr's offer of 12 months of identity monitoring and identity protection services to Plaintiffs and Class Members is woefully inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when additional harm occurs versus when it is discovered, and also between when PI

1    is acquired and when it is used.

2    **G. Noblr's delay in identifying and reporting the breach caused additional**
3    **harm**

4    113.   The actual date Plaintiffs and the Class Members' PI was improperly

5    exposed is unknown to Plaintiffs at this time, however, Noblr discovered the

6    Unauthorized Data Disclosure on or about January 21, 2021, and it was not until

7    almost four months later that Noblr began notifying those affected by the

8    Unauthorized Data Disclosure, depriving them of the ability to promptly mitigate

9    potential adverse consequences resulting from the Unauthorized Data Disclosure.

10    114.   As a result of Noblr's delay in detecting and notifying Plaintiffs and

11    Class Members of the Unauthorized Data Disclosure, the risk of fraud for Plaintiffs

12    and Class Members has been driven even higher.

13    <u>**CHOICE OF LAW**</u>

14    115.   Defendant Noblr is headquartered in San Francisco County, California.

15    That is the nerve center of Defendant's business activities—the place where high-

16    level officers direct, control, and coordinate Defendant's activities, including data

17    security, and where: (a) major policy; (b) advertising; (c) distribution; (d) accounts

18    receivable departments; and (e) financial and legal decisions originate.

19    116.   Data security assessments and other IT duties related to computer

20    systems and data security occur at Defendant's California headquarters.

21    Furthermore, Defendant's response, and corporate decisions surrounding such

22    response, to the Unauthorized Data Disclosure were made from and in California.

23    Finally, Defendant's breach of its duty—including to Plaintiffs and Class and

24    Subclass Members—emanated from California.

25    117.   It is appropriate to apply California law extraterritorially to the claims

26    against Defendant in this case due to Defendant's significant contacts with

27    California. Defendant is headquartered in California; the relevant decisions, actions,

28    and omissions were made in California; and Defendant cannot claim to be surprised

by application of California law to regulate its conduct emanating from California.

118.   To the extent California law conflicts with the law of any other state that could apply to Plaintiffs' claims against Defendant, application of California law would lead to the most predictable result, promote the maintenance of interstate order, simplify the judicial task, and advance the forum's governmental interest.

## CLASS ACTION ALLEGATIONS

119.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed Nationwide Class (the "Class"), defined as follows:

> All persons in the United States whose PI was compromised in the Unauthorized Data Disclosure announced by Noblr on or near May 14, 2021.

120.   Excluded from the proposed Class are any officer or director of Defendant; any officer or director of any affiliate, parent, or subsidiary of Noblr; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

121.   **Numerosity.** Members of the proposed Class likely number in at least the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendant's own records.

122.   **Commonality and Predominance.** Common questions of law and fact exist as to all proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a.      Whether Defendant engaged in the wrongful conduct alleged herein,

b.      Whether Defendant's inadequate data security measures were a cause of the Unauthorized Data Disclosure,

c.      Whether Defendant owed a legal duty to Plaintiffs and the other Class Members to exercise due care in collecting, storing, and safeguarding their PI,

d.      Whether Defendant negligently or recklessly breached legal duties owed to Plaintiffs and the other Class Members to exercise due care in collecting, storing,

and safeguarding their PI,

e.     Whether Defendant's online quote system auto-populated prospective quotes with PI obtained from the records of Defendant or third parties without the permission or consent of Plaintiffs and the Class,

f.     Whether Plaintiffs and the Class are at an increased risk for identity theft because of the data security breach,

g.     Whether Defendant's conduct violated Cal. Bus. & Prof Code § 17200 *et seq.*,

h.     Whether Defendant failed to provide timely notice of the Unauthorized Data Disclosure to Plaintiffs and Class Members in violation of California Civil Code § 1798.82,

i.     Whether Defendant violated the Drivers' Privacy Protection Act, 18 U.S.C. § 2724,

j.     Whether Plaintiffs and the Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief, and

k.     Whether Plaintiffs and the Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

123.   Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

124.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. All Class Members were subject to the Unauthorized Data Disclosure and had their PI accessed by, used and/or disclosed to unauthorized third parties. Defendant's misconduct impacted all Class Members in the same manner.

125.   **Adequacy of Representation:** Plaintiffs are adequate representatives of

the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

126. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the Class Members pale compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## FIRST CAUSE OF ACTION

**Violation of the Drivers' Privacy Protection Act ("DPPA"), 18 U.S.C. § 2724**

**(On behalf of Plaintiffs and the Nationwide Class)**

127. Plaintiffs incorporate the above allegations by reference.

128. The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains." 18 U.S.C. § 2724.

129. Under the DPPA, a "'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle

Plaintiffs' Second Amended Class Action Complaint

registration, or identification card issued by a department of motor vehicles.'" 18 U.S.C. § 2725(a).  Drivers' license numbers are motor vehicle records under the DPPA.  18 U.S.C. § 2725(3); *see also Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 943 (7th Cir. 2015).

130.   Defendant obtains motor vehicle records from its customers.

131.   Defendant also obtains motor vehicle records directly from state agencies or through resellers who sell such records.

132.   During the time period up until and including at least January 27, 2021, PI, including driver's license numbers, of Plaintiffs and Class Members, were publicly available via query on Noblr's instant quote webpage and Noblr knowingly both used and disclosed Plaintiffs' and members of the class's motor vehicle records for a purpose not permitted by the DPPA pursuant to 18 U.S.C. §§ 2724 and 2721(b).

133.   During the time period up until and including at least January 27, 2021, PI, including driver's license numbers, of Plaintiffs and Class Members, were publicly available in the source code of Noblr's website, Noblr knowingly configured its website to make such PI available, and Noblr used and disclosed Plaintiffs and Class Members' motor vehicle records for a purpose not permitted by the DPPA pursuant to 18 U.S.C. §§ 2624 and 2721(b).

134.   Through the Unauthorized Data Disclosure, Defendant disclosed motor vehicle records for purposes not authorized by the DPPA.

135.   Plaintiffs and putative Class Members are entitled to actual damages, liquidated damages, punitive damages, attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Negligence

### (On behalf of Plaintiffs and the Nationwide Class)

136.   Plaintiffs incorporate the above allegations by reference.

137.   Defendant owed a duty to Plaintiffs and the Class to exercise reasonable

care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, implementing, maintaining and testing its data security systems to ensure that Plaintiffs' and Class Members' PI in Defendant's possession, or that could be accessed by Defendant, was adequately secured and protected.

138.   Defendant owed a duty of care to Plaintiffs and Members of the Class to provide security, consistent with industry standards, to ensure that its systems and networks adequately protected PI it stored, maintained, and/or obtained.

139.   Defendant owed a duty of care to Plaintiffs and Members of the Class because they were foreseeable and probable victims of any inadequate data security practices. Defendant knew or should have known of the inherent risks in having its systems auto-populate online quote requests with private PI and without the consent or authorization of the person whose PI was being provided.

140.   Unbeknownst to Plaintiffs and Members of the Class, they were entrusting Defendant with their PI when Defendant obtained their PI from other businesses and state motor vehicle databases. Defendant had an obligation to safeguard their information and was in a position to protect against the harm suffered by Plaintiffs and Members of the Class as a result of the Unauthorized Data Disclosure.

141.   Defendant's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their PI. Defendant's misconduct included failing to implement the systems, policies, and procedures necessary to prevent the Unauthorized Data Disclosure.

142.   Defendant knew, or should have known, of the risks inherent in collecting and storing PI and the importance of adequate security. Defendant knew about – or should have been aware of - numerous, well-publicized unauthorized data disclosures affecting businesses, especially insurance and financial businesses, in the

1    United States.

2        143.   Defendant breached its duties to Plaintiffs and Class Members by failing

3    to provide fair, reasonable, or adequate computer systems and data security to

4    safeguard the PI of Plaintiffs and Class Members.

5        144.   Because Defendant knew that a breach of its systems would damage

6    thousands of individuals whose PI was inexplicably stored or was accessible,

7    including Plaintiffs and Class Members, Defendant had a duty to adequately protect

8    its data systems and the PI contained and/or accessible therein.

9        145.   Defendant also had independent duties under state and federal laws that

10   required Defendant to reasonably safeguard Plaintiffs' and Class Members' PI.

11       146.   In engaging in the negligent acts and omissions as alleged herein, which

12   permitted thieves to access Noblr's systems that stored and/or had access to

13   Plaintiffs and Class Members' PI, and which put PI on Noblr's website in a publicly-

14   available manner through its inclusion in the source code, Defendant violated

15   Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting

16   commerce," and the GLB Act. This includes failing to have adequate data security

17   measures and failing to protect Plaintiffs' and the Class Members' PI.

18       147.   Plaintiffs and the Class Members are among the class of persons Section

19   5 of the FTC and the GLB Act were designed to protect, and the injuries suffered by

20   Plaintiffs and the Class Members are the types of injury Section 5 of the FTC Act

21   and the GLB were intended to prevent.

22       148.   Neither Plaintiffs nor the other Class Members contributed to the

23   Unauthorized Data Disclosure as described in this Complaint.

24       149.   As a direct and proximate cause of Defendant's conduct, Plaintiffs and

25   Class Members have suffered and/or will suffer injury and damages, including but

26   not limited to: (i) the loss of the opportunity to determine for themselves how their

27   PI is used; (ii) the publication and/or theft of their PI; (iii) out-of-pocket expenses

28   associated with the prevention, detection, and recovery from  unauthorized use of

their PI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Unauthorized Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PI, which remains in Defendant's possession (and/or Defendant has access to) and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PI in its continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PI.

## THIRD CAUSE OF ACTION

### Violation of the California's Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200, *et seq*.

### (Brought by Plaintiffs and the Nationwide Class)

150.   Plaintiffs incorporate the above allegations by reference.

151.   By reason of the conduct alleged herein, Defendant Noblr engaged in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq*.

152.   Defendant stored and/or provided access to the PI of Plaintiffs and all Class Members in its computer systems.

153.   Defendant knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with federal regulations and that would have kept Plaintiffs' and all Class Members' PI secure

Plaintiffs' Second Amended Class Action Complaint

and prevented the loss or misuse of that PI.

**Unlawful Business Practices**

154.   Defendant violated the DPPA, Section 5(a) of the FTC Act, the GLB Act and California Civil Code § 1798.81.5(b) by failing to implement and maintain reasonable and appropriate security measures or follow industry standards for data security, and by failing to timely notify Plaintiffs and all Class Members of the Unauthorized Data Disclosure.

155.   If Defendant had complied with these legal requirements, Plaintiffs and the Class Members would not have suffered the damages related to the Unauthorized Data Disclosure, and Defendant's notification of it.

156.   Plaintiffs and all Class Members suffered injury in fact and lost money or property as the result of Defendant's unlawful business practices. In addition, Plaintiffs and all Class Members' PI was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiffs and all Class Members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

**Unfair Business Practices**

157.   Defendant engaged in unfair business practices under the "balancing test." The harm caused by Defendant's actions and omissions, as described in detail above, greatly outweigh any perceived utility. Indeed, none of Defendant's actions or inactions can be said to have had any utility at all. Defendant's failures were clearly injurious to Plaintiffs and all Class Members, directly causing the harms alleged below.

158.   Defendant also engaged in unfair business practices under the "tethering test." Defendant's actions and omissions, as described in detail above, violated fundamental public policies expressed by the California Legislature. See, e.g., Cal.

Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

159.   Defendant engaged in unfair business practices under the "FTC test." The harm caused by Defendant's actions and omissions, as described in detail above, is substantial in that it affects tens of thousands of Class Members and has caused those persons to suffer actual harms. Such harms include a substantial risk of identity theft, disclosure of Plaintiffs' and all Class Members' PI to third parties without their consent, diminution in value of their PI, consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures. This harm continues given the fact that Plaintiffs' and all Class Members' PI remains in Defendant's possession, without adequate protection, and is also in the hands of those who obtained it without their consent. Defendant's actions and omissions violated Section 5(a) of the Federal Trade Commission Act. See 15 U.S.C. § 45(n) (defining "unfair acts or practices" as those that "cause[ ] or [are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"); see also, e.g., *In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act).

160.   Plaintiffs and all Class Members suffered injury in fact and lost money or

property as the result of Defendant's unfair business practices. Plaintiffs and all Class Members' PI was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiffs and all Class Members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

161.   As a result of Defendant's unlawful and unfair business practices in violation of the UCL, Plaintiffs and all Class Members are entitled to equitable and injunctive relief, including restitution or disgorgement.

## FOURTH CAUSE OF ACTION

### Declaratory and Injunctive Relief

### (Brought by Plaintiffs and the Nationwide Class)

162.   Plaintiffs incorporate the above allegations by reference.

163.   This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

164.   As previously alleged, Plaintiffs and Class Members had a reasonable expectation that companies such as Defendant, who could access their PI through automated systems, would provide adequate security for that PI.

165.   Defendant owes a duty of care to Plaintiffs and Class Members requiring it to adequately secure PI.

166.   Defendant still possesses PI regarding Plaintiffs and Class Members.

167.   Since the Unauthorized Data Disclosure, Defendant has announced few if any changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Unauthorized Data Disclosure to occur and, thereby, prevent further attacks.

168.   The Unauthorized Data Disclosure has caused actual harm because of Defendant's failure to fulfill its duties of care to provide security measures to

Plaintiffs' Second Amended Class Action Complaint

Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their PI and Defendant's failure to address the security failings that lead to such exposure.

169.   There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Unauthorized Data Disclosure to meet Defendant's legal duties.

170.   Plaintiffs, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with its duties of care to provide adequate security, and (2) that to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a.      Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors,

b.      Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring,

c.      Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures,

d.      Ordering that Defendant not transmit PI via unencrypted email and not be permitted to put PI as part of its source code or otherwise be available on its instant quote webpage,

e.      Ordering that Defendant not store or make accessible PI in any publicly facing website,

f.      Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services,

g.      Ordering that Defendant conduct regular computer system scanning and security checks, and

h.    Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a disclosure when it occurs and what to do in response to a breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that the Court enter an order:

a.  Certifying the proposed Class as requested herein,

b.  Appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel,

c.  Finding that Defendant engaged in the unlawful conduct as alleged herein,

d.  Granting injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Noblr from engaging in the wrongful and unlawful acts described herein,

    ii.   requiring Noblr to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws,

    iii.  requiring Noblr to delete, destroy, and purge the personal information of Plaintiffs and Class Members unless Noblr can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members,

    iv.   requiring Noblr to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal information of Plaintiffs and Class Members' personal information,

v.   prohibiting Noblr from maintaining Plaintiffs' and Class Members' personal information on a cloud-based database,

vi.   requiring Noblr to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Noblr's systems on a periodic basis, and ordering Noblr to promptly correct any problems or issues detected by such third-party security auditors,

vii.   requiring Noblr to engage independent third-party security auditors and internal personnel to run automated security monitoring,

viii.   requiring Noblr to audit, test, and train its security personnel regarding any new or modified procedures,

ix.   requiring Noblr to conduct regular database scanning and securing checks,

x.   requiring Noblr to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal information, as well as protecting the personal information of Plaintiffs and Class Members,

xi.   requiring Noblr to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach,

xii.   requiring Noblr to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Noblr's policies, programs, and systems

Plaintiffs' Second Amended Class Action Complaint

for protecting personal information,

xiii.   requiring Noblr to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Noblr's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated,

xiv.   requiring Noblr to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal information to third parties, as well as the steps affected individuals must take to protect themselves,

xv.   requiring Noblr to design, maintain, and test its computer systems to ensure that PI in its possession is adequately secured and protected,

xvi.   requiring Noblr disclose any future data disclosures in a timely and accurate manner; and

xvii.   requiring Defendant to provide ongoing credit monitoring and identity theft repair services to Class Members.

e.   Awarding Plaintiffs and Class Members damages,

f.   Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest on all amounts awarded,

g.   Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

h.   Granting such other relief as the Court deems just and proper.

Plaintiffs' Second Amended Class Action Complaint

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs, on behalf of themselves and the proposed Class, hereby demand a

3

trial by jury as to all matters so triable.

4

Dated: March 7, 2022            /s/ Gayle M. Blatt

5

GAYLE M. BLATT

6

**CASEY GERRY SCHENK**

7

**FRANCAVILLA BLATT & PENFIELD, LLP**

David S. Casey, Jr.

8

*dcasey@cglaw.com*

Gayle M. Blatt

9

*gmb@cglaw.com*

P. Camille Guerra

10

*camille@cglaw.com*

11

110 Laurel Street

San Diego, CA 92101

12

Telephone: (619) 238-1811

13

Facsimile: (619) 544-9232

14

Kate M. Baxter-Kauf (MN #0392037)

15

*admitted pro hac vice

Karen Hanson Riebel (MN #0219770)

16

*admitted pro hac vice

17

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

100 Washington Avenue South

18

Suite 2200

Minneapolis, MN 55401

19

Telephone: (612) 339-6900

Facsimile: (612) 339-0981

20

kmbaxter-kauf@locklaw.com

21

khriebel@locklaw.com

22

23

24

25

26

27

28

49                                    4:21-cv-04537-JSW